OPINION
{¶ 1} This case is remanded to this court after reversal by the Ohio Supreme Court. State v. Conese, 102 Ohio St.3d 435,2004-Ohio-3889. We had originally reversed the conviction and sentence of defendant-appellant, Mark Conese, for Soliciting or Receiving Improper Compensation, in violation of R.C. 2921.43(C), and ordered him discharged as to that offense, upon the ground that an employee could not be coerced into making a contribution, within the meaning of the statute, unless the victim actually made the contribution that was the subject of the coercive act. In view of our disposition of the appeal, we overruled Conese's other two assignments of error as moot.
 {¶ 2} The Ohio Supreme Court reversed the judgment of this court, holding that the actual making of a contribution is not required, so long as the actor performs a coercive act with the requisite intent of coercing the victim into making the contribution. Id. After reconsideration, the Ohio Supreme Court amended its mandate, in paragraph 14 of its original opinion, to read as follows: "Accordingly, we reverse the judgment of the court of appeals and remand the cause to the court of appeals for consideration of appellant's remaining assignments of error and further action not inconsistent with this opinion." State v.Conese (Oct. 14, 2004), Reconsideration Entry in Case No. 03-922.
 {¶ 3} Thus, Conese's second and third assignments of error are now before us for consideration. Neither party has filed a supplemental brief, nor has either party requested further argument in this appeal, which was argued orally when this case was first pending in this court.
 I {¶ 4} The facts, as set forth in the original opinion of this court filed herein on April 7, 2003, are as follows:
 {¶ 5} In February, 2000, defendant-appellant, Mark Conese, was the Central Committee Chairman of the Butler County Democratic Party, and a member of the Board of Elections. During that time period, the Butler County Democratic Party was experiencing financial difficulties. Conese and another board member decided to meet with an employee of the Board of Elections, Brent Dixon, in order to request Dixon to donate more money to the Party.
 {¶ 6} Brent Dixon was, at that time, one of the Board of Election's Special Assistants. The Special Assistant position is considered a "patronage" job, in that the employee serves at the pleasure of the political party recommending the employee. Dixon had held the Democratic Party's Special Assistant position for nine years. Dixon was paid approximately $6,000 per year and was provided with retirement and health insurance benefits.
 {¶ 7} Dixon was concerned that two high-ranking Democratic officials wanted to meet with him, only, and with no other Democratic employees. He decided to tape record both his telephone conversation with Conese, during which they arranged the meeting, and the actual meeting. During the telephone conversation, Conese stated that he wanted Dixon to "stay on with the Board." He also said that, "[w]e want to talk to you about what we want to do and how we want to do it."
 {¶ 8} On March 1, 2000, Dixon met with Conese and the other Board member at Democratic Party Headquarters. Conese told Dixon that the Party was in financial trouble, and that the party needed him to double his contributions.[1] Dixon reacted with hostility to the request, and felt that Conese had insulted him. Conese told him that he was not being insulted. Conese also reminded Dixon that his position with the Board was a "patronage" job, that he owed his employment to the Party, and that he served at the Party's pleasure. Conese also explained that when the Board hired a new Special Assistant, that person would be fired if he did not contribute his entire salary to the Party.[2]
When Dixon asked whether he would lose his job, he was informed that it was a "possibility" if he did not make the donation. Conese also stated, "I don't want to be the person that fires ya [sic], and I don't want to threaten you because I want you to continue in that role."
 {¶ 9} At the primary election following the meeting, Dixon switched his registration from the Democratic Party to the Republican Party and was immediately hired as one of the Republican Special Assistants to the Board. He never made the donation requested by Conese.
 {¶ 10} Thereafter, Conese was charged with one count of Misconduct of a Member or Employee of a Board of Elections, in violation of R.C. 3599.16(F), and one count of Soliciting or Receiving Improper Compensation, in violation of R.C. 2921.43(C). Following trial, the jury could not reach a verdict on the Misconduct count, and the trial court then sustained a motion for judgment of acquittal on that count. Conese made a motion for judgment of acquittal, pursuant to Crim.R. 29, with regard to the Soliciting or Receiving charge, which the trial court overruled. The jury found Conese guilty of Soliciting or Receiving Improper Compensation, and Conese was sentenced accordingly. From his conviction and sentence, Conese appeals.
 II {¶ 11} Conese's Second Assignment of Error is as follows:
 {¶ 12} "THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANTA-PPELLANT WHEN IT EXCLUDED HIS EXPERT FROM TESTIFYING."
 {¶ 13} Conese sought to call, as an expert witness on his behalf, Larry Nadler, a professor of communications at Miami University, in Oxford, Ohio. Nadler had listened to the tape recording of the conversation that Conese and another member of the Board of Elections, Don Daiker, had had with Dixon. Nadler was prepared to testify, based on his having listened to the tape recording, that Conese had not made any threats or coercive statements to Dixon. The trial court excluded Nadler's testimony, finding that it did not come within the ambit of Evid.R. 702(A), which provides, in pertinent part, as follows:
 {¶ 14} "A witness may testify as an expert if all of the following apply:
 {¶ 15} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons; * * *"
 {¶ 16} We agree. We have listened to the tape in question. The subject matter, as well as the dynamics of the conversation and the particular words used, are well-within the common experience of lay persons. Indeed, whether a statement "is a threat made to force another into doing or refraining from something concerning which he has a legal freedom of choice," which the Ohio Supreme Court found to be the essential element of the offense, at 102 Ohio St.3d 436, turns upon what a reasonable person would understand. If a reasonable person would not construe the statement as a threat, the fact that the particular listener took it to be a threat would not convert an otherwise innocent remark into a violation of the statute. Thus, a jury of lay persons is in the best position to determine what a reasonable person would take the remark to mean, at least in the absence of the use of jargon or other technical words requiring expert interpretation.
 {¶ 17} Conese's Second Assignment of Error is overruled.
 III {¶ 18} Conese's Third Assignment of Error is as follows:
 {¶ 19} "THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANTA-PPELLANT WHEN IT REFUSED TO GRANT A MISTRIAL."
 {¶ 20} During the conversation among Dixon, Conese and Daiker, after Dixon told Conese and Daiker that he was insulted by their request that he contribute his entire net salary, after taxes, to the Butler County Democratic Party, Conese and Daiker pointed out that Dixon would still enjoy the benefits of the health insurance and pension accruals available to him as a county employee. When this failed to move Dixon, Conese and Daiker pointed out that Dixon was not well known within the local Democratic party, and that there were others active in the local party, perhaps equally deserving of a job with the Board of Elections, who might not understand Dixon's reluctance to contribute. Dixon then raised the hypothetical question whether, if someone else agreed to contribute the entire salary, got Dixon's job on that basis, and then balked, contributing only half the salary, as Dixon had been doing, that person would be fired. Daiker and Conese both responded, immediately, "I'd fire him in a minute."
 {¶ 21} On cross-examination, Conese, who testified in his own defense, sought to explain that despite how he might have sounded on the tape, his response was a question, not a statement. That testimony and colloquy proceeded as follows:
 {¶ 22} "A. Right. Contrary to what's been testified before, at that point I didn't say I'd fire his ass. I never I said [sic] about the hypothetical person to Brent [Dixon] that I'd fire his ass. I say at that point, fire him in a minute, or I'd fire him in a minute. Something to that effect.
 {¶ 23} "Q. You're making a statement at that point?
 {¶ 24} "A. I did not mean it as a statement.
 {¶ 25} "Q. How'd you mean it?
 {¶ 26} "A. I meant it as a question.
 {¶ 27} "Q. You previously testified. Okay, go ahead.
 {¶ 28} "A. I meant it as a question. My hands came up. I was looking at Brent Dixon, Chairman Daiker was looking away from me. I meant it as a question. Now, it may sound as a statement on the tape. I did not mean it anything about Brent Dixon. They're talking about a hypothetical person. I start to do this with my hands and I have like a question mark on my face. I have a quizzical look. Chairman Daiker responds and then says absolutely, as if he's answering me. I don't know who took it as a question. I did not mean it as a statement that Brent, you're being fired. They were talking about a hypothetical person and I did not mean it to be a threat to Brent Dixon.
 {¶ 29} "Q. You've testified in the past that you meant that to be a question?
 {¶ 30} "A. Yeah, that's. When, when you raise you hands [sic] your voice may not be as expressive, but I think the body language and everything else, I meant it as a question. But, I, I didn't mean it as a threat to Brent Dixon at all.
 {¶ 31} "Q. Okay. Well I want to, we'll get to that and I want to wind it back to that.
 {¶ 32} "A. It may very well sound as a statement to you, and it may sound as a statement to somebody else. That's not what I intended.
 {¶ 33} "Q. Did you have the tape analyzed by a professional communications expert?
 {¶ 34} "A. Yes. Eventually I think we played it for Professor Nadler.
 {¶ 35} "Q. Professor Nadler said that its [sic] a statement, its [sic] not a question. Isn't that true?
 {¶ 36} "Mr. Shanks: Objection.
 {¶ 37} "By the Court: Objection is sustained.
 {¶ 38} "A. That's not true.
 {¶ 39} "By the Court: Jury will disregard, excuse me sir. As I've indicated to you ladies and gentlemen, statements made by attorneys are not evidence. They are simply questions. The only evidence comes to you from the witness stand. So you are to disregard that statement made in the form of a question by the attorney."
 {¶ 40} Later, following the conclusion of Conese's testimony and before the case was argued to the jury, Conese moved for a mistrial, based upon the prosecutor's reference to Nadler's analysis of the statement (or question), referred to in the above-quoted passage. This motion was denied.
 {¶ 41} The trial court quite properly sustained Conese's objection to the prosecutor's reference to Nadler's analysis of the phrase uttered by Conese on the tape as a statement or question. The state had succeeded in obtaining a ruling that Nadler's analysis of Conese's utterances was not a proper subject of expert testimony.
 {¶ 42} Under other circumstances, we might conclude that the state's conduct in bringing to the attention of the jury one part of Nadler's analysis that might have been adverse to Conese, after successfully, and correctly, obtaining the exclusion of Nadler's analysis as not a proper subject of expert testimony, was so egregious as to warrant the extreme remedy of a mistrial. In these circumstances, we conclude that the state's conduct, while indefensible, was not so prejudicial as to require a mistrial.
 {¶ 43} We have listened to the tape recording — specifically to that portion where, in response to Dixon's hypothetical question whether an employee who promised to donate all of his salary, but then only donated half, would be fired, and Daiker and Conese immediately responded "I'd fire him in a minute." Although it is only an audiotape recording, and therefore fails to capture any gestures or other body language that Conese may have used, it is the same evidence of that utterance that the jury had before it. There is nothing in the audiotape recording that gives rise to the faintest suggestion that "I'd fire him in a minute" was equivocal or questioning. It was clearly an unequivocal response, given immediately by both Daiker and Conese, expressing what would happen to the hypothetical balking employee. Under these circumstances, we cannot imagine any reasonable jury taking Conese's "I'd fire him in a minute" to be anything other than a statement, and an unequivocal one, at that. Thus, the state's conduct in bringing Nadler's inadmissible analysis to the attention of the jury, while inexcusable, was harmless, or at least not so prejudicial as to require a mistrial.
 {¶ 44} Conese's Third Assignment of Error is overruled.
 IV {¶ 45} Conese's Second and Third assignments of error having been overruled, and his First Assignment of Error having been disposed of, adversely to Conese, by the Ohio Supreme Court inState v. Conese, 102 Ohio St.3d 435, 2004-Ohio-3889, the judgment of the trial court is Affirmed.
Wolff and Young, JJ., concur.
Fain, J., and Wolff, J., of the Second Appellate District, sitting by assignment of the Chief Justice, pursuant to Section 5(A)(3), of the Ohio Constitution.
Young, J., Retired from Second Appellate District, sitting by assignment of the Chief Justice, pursuant to Section 5(A)(3) of the Ohio Constitution.
[1] The record reveals that Conese was aware that Dixon donated $200 every two weeks, and that by doubling his donation he would be paying his entire after-tax salary to the Party.
[2] At the time, the Board was preparing to hire one additional Special Assistant for each political party.